Please rise, Mr. Public Court of the 3rd Judicial District of the State of Illinois is now in session. Mr. Court, please proceed. Mr. Court, please. Case number 317-0055, Michelle McManus accompanied by James DeMuda v. Anne Richards, accoladed by Brett Nassel. Counsel, please proceed. Good morning. May it please the Court, Counsel. I am here today representing Michelle McManus, a plaintiff appellant, who is requesting this Court reverse the Circuit Court's order granting summary judgment in favor of Dr. Anne Richards. This case relates primarily to the word cause as contained in Section 19 of the Party's Agreement for Seal of Membership Interest. If this Court were to rule the Circuit Court adopted the wrong definition of cause, or the Circuit Court erred in finding as a matter of law that Dr. Richards had cause to disassociate Dr. McManus from the Party's orthodontic practice, then this Court need only remand this case and need not consider the other issues raised by Dr. McManus in her appeal. As urged by Dr. McManus in her brief, this Court should adopt the legal definition of cause used in the employment law context. For example, in the Bishop v. Lakeland Animal Hospital case, the 2nd District recognized cause as some substantial shortcoming recognized by law and public opinion as good cause for termination. In the context of this case, this Court need only substitute the word disassociation for termination in that phrase defining cause. And if this Court so holds, it must then remand this case for a factual determination of whether Dr. McManus engaged in actions amounting to cause for disassociation. In the alternative, if this Court does not apply a legal meaning to the word cause, this Court should determine the term is susceptible to more than one meaning. If this Court makes a determination to that effect, then the jury would determine the factual issue of the Party's intent as to the meaning of the word cause and whether Dr. Richards had cause to disassociate Dr. McManus. Only if this Court were to find the term cause susceptible to only one meaning, meaning being that specific dictionary definition selected by Dr. Richards, and there is no genuine issue of material fact as to whether Dr. Richards did in fact have cause to involuntarily disassociate Dr. McManus, can this Court affirm the Circuit Court Summary Judgment ruling. Dr. McManus respectfully submits that the Court cannot affirm the Circuit Court's Summary Judgment ruling, as the Circuit Court erred by creating its own arbitrary definition of cause and finding as a matter of law Dr. Richards had cause to disassociate Dr. McManus. The Circuit Court stated in its Summary Judgment ruling, No case law involving a partnership agreement has presented itself in which the partnership agreement did not define good cause for termination, so there is no precedent on all fours for this case to draw upon. As an initial matter, I would note that this technically is not a partnership agreement. It is an agreement relating to a limited liability company, which is an entity created and described by Illinois statute. And while the Circuit Court uses the phrase good cause for termination, the Circuit Court ignored the employment context cases cited by Dr. McManus. The Circuit Court's justification for doing so is that an employment contract involves an employer with much greater power and leverage than the employee, and so some restrictions must be imposed on termination to help protect the weaker party being the employee. The Circuit Court therefore rejected the employment cases cited by Dr. McManus in favor of Dr. Richards' Crawford dictionary definition, and I submit respectfully that the Circuit Court erred in doing so. As an initial matter, in the private employer context, an employment contract with a for-cause termination provision is generally not the result of weak bargaining power on the part of the employee, I would submit. While unequal bargaining power may be a permissible factor for a court to consider in interpreting a contract, here Dr. McManus was purchasing a 50% interest in the party's limited liability company over time. She was a minority member, a minority ownership. She had a minority ownership interest. And at the time that Dr. Richards, we would say wrongfully, disassociated Dr. McManus from the practice, she was in that minority ownership position much like an employee in an employer-employee relationship. Dr. Richards thought she had the ability to fire Dr. McManus, and at that time Dr. McManus also thought that Dr. Richards could fire her. Therefore, at the same time, both parties at some level thought of the relationship as an employer-employee relationship. Thus, we would argue this factor favors Dr. McManus's proffered contract interpretation. Further, the circuit court states this case involves simpler contract interpretation, but then states this is a complicated contract. The circuit court concludes presumably if the parties were able to think through the procedures after an involuntary disillusion, they would have been able to establish cause for an involuntary disillusion and commit that to the contract if they so desired. Yet they did not. To read such a provision into the contract would be to allow one party to unilaterally impose a restrictive condition on the other party, which runs counter to the traditional definition of a contract as a voluntary agreement between two parties. Therefore, the circuit court suggests because the parties did not define the term cause, they did not voluntarily agree to use the word cause in its legal sense. The circuit court simply ignored the body of case authority defining the term cause in the state of Illinois and erroneously refused, in our opinion, to give such term its legal meaning as it should have done. Ironically, I would say the circuit court concluded Dr. McManus is the party seeking to rewrite the party's agreement. And again, I submit that conclusion is wrong. Instead, if the arguments of Dr. Richards are accepted and affirmed, and the circuit court's interpretation is upheld, then the meaning of the term cause in Section 19 will have been altered. In relevant parts, Section 19 actually reads as follows. In the event that Richards finds cause to involuntarily disassociate McManus from the company's dental practice, I submit to reach the circuit court's interpretation and Dr. Richards' proper interpretation requires changing this language. What the circuit court is really saying to its ruling is this sentence should read as follows. In the event that Dr. Richards finds a reason to involuntarily disassociate Dr. McManus, as reason was the definition that the circuit court adopted for the term cause. If we move farther from that actual language, we can eventually reach what I think is Dr. Richards' proposed interpretation of that phrase of Section 19. What about the following, for example? In the event that Dr. Richards chooses to involuntarily disassociate Dr. McManus, I submit that that is not enough even to reach Dr. Richards' proper interpretation. What about the following? In the event that Dr. Richards chooses in her sole and absolute discretion to involuntarily disassociate Dr. McManus, I would submit that's still not far enough. What I think Dr. Richards is really proposing is something like the following. In the event that Dr. Richards chooses in her sole and absolute discretion to involuntarily disassociate Dr. McManus, which choice is subjective and the duty of good faith and fair dealing and statutory fiduciary duties shall not apply to Dr. Richards' choice and further Dr. Richards' choice shall not be subject to any review by any court. That interpretation makes the language in question effectively the equivalent of the prior part of Section 19 regarding Dr. McManus' right to leave the practice, which states in relevant part as follows. In the event that the purchaser, meaning Dr. McManus, should voluntarily elect to no longer practice dentistry under the joint dental practice with Dr. Richards, the circuit court effectively created the same standard for Dr. Richards' ability to involuntarily disassociate Dr. McManus. However, the fact is the party's contract requires a higher standard for Dr. Richards to remove Dr. McManus from the practice than it requires for Dr. McManus to determine to leave the practice on her own accord. The circuit court's ruling clearly destroys that fact, especially in light of Dr. Richards' fiduciary duties to Dr. McManus. If the parties intended to create the same standard for Dr. Richards to involuntarily remove Dr. McManus from the practice, as that which applies to Dr. McManus if she determines to leave the practice on her own accord, the parties would have simply written parallel provisions using the same substantially similar language. A parallel provision granting Dr. Richards a similar right to involuntarily remove Dr. McManus from the practice would read as follows. In the event that Dr. Richards voluntarily elects to involuntarily disassociate Dr. McManus from the company's dental practice. However, the parties did not include those parallel withdrawal and disassociation provisions in their contract, which they could have done. Rather, the different language used in these two parts of Section 19 show the parties clearly intended the standard for the involuntary disassociation of Dr. McManus by Dr. Richards to be higher than Dr. McManus' right to leave the practice on her own accord. The terms voluntarily elect and finds cause are not equal. Dr. McManus therefore respectfully submits this honorable court should reverse the circuit court summary judgment ruling, give the term cause its legally significant meaning, and remand this case for a jury determination as to whether Dr. Richards had cause to disassociate Dr. McManus from the party's orthodontic practice. Thank you. I have a question. Yes. If I understand the contract, Dr. McManus had the ability to voluntarily dissociate from the practice. And if she did that, then Dr. Richards would buy back her shares at 100% of their value. And then if she, if Dr. Richards had the same right to voluntarily disassociate from the business, and if she did, then Dr. McManus would have a right of first refusal to buy her shares. The only different provision is the involuntary dissociation of Dr. McManus. I couldn't find a corresponding right for Dr. McManus to involuntarily disassociate Dr. Richards. So basically, if I understand this correctly, Dr. Richards had the right to fire Dr. McManus. Dr. McManus did not have a corresponding right. Is that correct? That is correct. And when the court says fire, we mean, or I mean, or the contract means, disassociate for cause. Which is the rational equivalent of fire. Correct. Okay. Yes. And so those are the legal ways that the two parties can get out of this arrangement. That is correct, under the terms of this agreement, yes. Okay. Yes. Thank you. Thank you. Counselor, you may proceed. Thank you, Your Honor. May it please the Court, Counsel? Counselor? Brett Nelson, I represent Dr. Bromwell Richards. And I'm asking the Court to affirm the trial court level, Judge Fackel. This is a case of contract interpretation. The employment law cases, they're just not applicable to this situation. This is a situation where we have two equally-powered individuals that have been doing business together as orthodontists, that they've decided they're going to come into business and be partners. They're going, yes, ma'am? I'm sorry. It's not really equal, is it? Dr. Richards has the right to involuntarily disassociate Dr. McManus. Dr. McManus does not have a right to do that. Yes, ma'am. I agree with that. I was talking more in reference to the formation of the contract itself. When Dr. McManus and Dr. Richards negotiated the deal that is at issue today, the operating agreement, they both, it was a situation where there was a willing buyer and a willing seller, and they came to terms. I believe in the employment law context, traditionally the employer generally has a leg up on the employee, and so we generally get a thread, a common theme to those lines of cases where the court's trying to equalize that bargaining power. I don't believe that the employment law cases in that line of protecting the weaker party is applicable to this particular situation, because when the contract was formed, Dr. McManus and Dr. Richards were on the same page. They were on the same level. They were both board-certified orthodontists. Dr. McManus had the ability to go do what she wanted to do, where she wanted to do it, and she chose to do it with Dr. Richards. It was the orthodontics. So for that reason, I don't believe the employment law context, those cases are applicable to our situation. Dr. McManus' interbrief also makes reference to the Limited Liability Act, Company Act in the state of Illinois. I likewise don't believe that those line of cases or that statute is applicable to this particular situation, because the parties had an operating agreement. They had reduced their agreement to writing, and that writing takes place with the Limited Liability Act. Well, I disagree with that, Your Honor. How can you disagree with that, given the terms of the agreement? Because Dr. Richards, in essence, brought Dr. McManus on as a partner from the get-go and allowed her to use her money that she was otherwise producing from an existing business to buy the shares. She didn't require her to go out and get a loan. She internally financed this, and if Dr. McManus didn't like the terms, she was free to go practice orthodontia somewhere else. She didn't have to do that. She had gotten two years of experience. She's from the community. She had that opportunity. So I don't think that once the agreement was struck, there was a disparity in ownership because Dr. McManus hadn't earned her way into the 50-50 yet. So while I can see that from the actuality of what was going on in the office, there should have been some deference paid to Dr. Richards, I believe, because she was the incumbent doctor, and Dr. McManus was coming into her practice. Dr. Richards had the experience, and there should have been some deference, in my opinion, with respect to how the business was run and those types of things. And I think that led to actual conflict. Part of the conflict that broke down this relationship was because there was not deference given. There was not that just, I guess, the deference that one would think would be afforded to someone who's giving another person an opportunity to buy into their business. So there was a disparity in bargaining power? I don't believe there was at the formation of the agreement. I believe that once the agreement was formed, until Dr. McManus earned her 50% share, I would agree that there was a disparity in power, not in the formation. At the time of the contracting, how long had Dr. McManus practiced as a board certified orthodontist? She began practicing in 2010 with Dr. Richards, and I believe it was the beginning of 2012 when she started the body. So she started practicing as an orthodontist in 2010? Yes, sir. That's my recollection. And Dr. Richards had been around a while? At the time, I think she'd been there 16, 17 years. Two years and 16 years. Yes, sir. And they had a pretty interesting relationship. Dr. McManus, many years ago, had been the nanny to Dr. Richards' children. So there was a history there. So what is the operating agreement? What does it mean? The circuit court had to define what does Richards' fine cause mean? And the situation might be different today if the language was something like Richards can involuntarily disassociate McManus for a cause, or if Richards has cause, or if she could involuntarily disassociate McManus with cause. Well, what did the contract say if Dr. McManus wanted to involuntarily disassociate? What language was used if Dr. McManus wanted to leave the practice? If Dr. McManus wanted to leave the practice, it was if Dr. McManus voluntarily elects to disassociate. That's essentially what the language was for her to leave. And it didn't say for cause. It just says she basically has unconditional right to leave. Yes, but it costs her half her investment. Nowhere in the contract does it say for cause. It says Richards' fines cause. And for us to give that phrase, and the circuit court, I think, really aptly pointed out that, you know, the phrase Richards' fines cause is different than the phrase for cause, or with cause, or has cause. And in an employment law context, you know, we're courts defining for cause all the time. But we don't have that. We're here on summary judgment, so we don't know if there was cause or there wasn't cause, because the summary judgment, the trial court said, didn't need to be a reason other than I don't want you here anymore. And so with this thing, somebody's coming in and buying in, do you think under contract law, and under this contract, that Richards had any fiduciary duty to treat McManus reasonably and not dissociate unless it was in good faith? I believe every contract has a duty of good faith and fair dealing built into it. And I think the Lakeland case cited by the appellant speaks to that. And I believe Dr. Richards fulfilled that duty of good faith and fair dealing by following the terms of the contract. I think the elements of the bargain are there. The case says the duty of good faith and fair dealing, page 13 of my brief, it says the purpose of the duty of good faith and fair dealing is to ensure that the parties do not take advantage of each other in a way that could not have been contemplated at the time of the contract was drafted or do anything that would destroy the other party's rights to receive the benefit of the contract. And I believe that under the facts of this case, Dr. Richards followed the contract in choosing to disassociate Dr. McManus within the bounds of the agreement. And it's an unfortunate situation that the conflict and the disenfranchisement that was present in the environment led Dr. Richards to that decision. Well, and of course we don't know about that because, I mean, what the facts were behind Dr. Richards' choice. She might have had all the cause in the world, but that's not whether she did or didn't is before us. Am I correct about that? I believe there are undisputed facts. And when undisputed facts, there's only one reasonable conclusion. Regarding those undisputed facts, I still believe summary judgment is appropriate. And the circuit court found, and I believe the affidavits and the testimony that is in the record demonstrated that there is all sorts of conflict. Both doctors were coming to the office crying from the turmoil and the upset. There's two factions of employees. Dr. McManus was perceived to be undermining Dr. Richards. Dr. McManus was doing other things that Dr. Richards found to be offensive. They had to have an office manager serve as a mediator. And the only dispute is who's at fault? Was it Dr. McManus causing it or was it Dr. Richards? And really, the fact of the matter is there was all sorts of conflict. This was a toxic work environment. Employees didn't like to go to work anymore. That's that. And Dr. McManus wants to say, yeah, but the practice was doing well. But yeah, but for how long? Those types of environments when you're in a service-based business don't do well. And so... These are all attached to the summary judgment motion? Yes, sir. These were all attached? Yes. Yes, sir. And there's actually testimony from the preliminary injunction hearing that was incorporated into the record that's found there. The depositions of both parties, the affidavits that were attached to the motion, they're all in the record, and the things that I'm mentioning are in the record. Mr. Nelson, if we were to find that this arrangement was essentially an employment contract, would you agree that that imposes some cause obligations on the employer? No, ma'am, I do not. And the reason is because they have an agreement here, and the agreement speaks to how Dr. McManus can get out of it and how Dr. Richards can get out of it. I just asked about the cause. No, I don't believe it does. I mean, absent something creating, Illinois is an at-will state, and something that creates, there would have to be something that created that obligation on Dr. Richards. And in this particular situation, we don't have that. We have a situation where the parties reached an agreement, and that agreement spoke to and addressed this very circumstance. So if this is an employment contract? Yes, ma'am. That does not impose an obligation on the employer to have cause in order to terminate the employment of the other? I do not believe so. And the reason I disagree with that assertion is based upon the document. Because if you find the operating agreement to be an employment contract, the employer-employee relationship would be governed by that document, that writing, and we're right back to where we are. What does Richards find cause mean? And that's a contract interpretation question. Then the employment law cases tell us what kind of cause is necessary. Well, in my view, the employment law cases are interpreting phrases, for cause, with cause, has cause. They're not interpreting the phrase Richards finds cause. And I think there's a significant difference. If you accept the appellant, Dr. McManus' argument, what does Richards finds mean? Under Illinois law, we have to give effect to every word that's used in the contract. If you accept their argument, my question is, what does Richards finds mean? There's no meaning to it. No. What does Richards finds cause mean? Exactly. Richards finds cause. What does that mean? My assertion is that Richards finds that there is a reason to disassociate that. And that has to be exercised in good faith because, as the Lakeland case says, when you have disproportionate bargaining powers that give you good faith and fair dealing imposed in every contract. And she can't act arbitrarily or capriciously towards Dr. McManus. And I don't believe there's any evidence of that in this case. Bottom line is, you, apparently the trial judge, think that finds cause means chooses to do this. We believe that cause means reason. And if you look at the Lakeland definition, it says, some substantial shortcoming recognized by law and public opinion as a good reason for termination. Okay? That's what that Lakeland case says. And it says recognized by law and public opinion. My assertion is, our assertion is, is that Lakeland, it's an employment restrictive covenant case, as we all know. But the situation here is, the Lakeland court says it's a good reason. And in this case, we're saying it's a reason. Okay? And the duty of good faith, maybe she has to have a good reason. Well, some are saying it can be a bad reason. I believe that there is an element of good faith and fair dealing in this contract. And I believe that the court found on the undisputed facts that this was a toxic relationship, and that because of that, there was a good reason. Counsel has one minute. You know, if there was a voluntary disassociation, the person got some of their money back, right? Half the money back. Half the money. So if there was an involuntary disassociation. They get it all. They get all the money back. All the money back. In this case, it would be almost $707,000. So they got all the money back. Well, we – it's outside the record, Judge. I can't – Justice, I can't speak to that. Actually, it might be in the record. We've tried. Well, the contract says that gets her money back either at your client's choice, either in an all-sum payment or a quarterly payment over three years with no interest. Right. Sure. That is what the agreement says. But when you look at how she paid that $700,000 in, she paid it through the profits that she got from the business that – I mean, traditionally when you buy a business, you have to go find third-party funding and then pay a bunch of money, and then you get your ownership. In this particular situation, she got paid during the year for the ownership, and was receiving money, I mean, a lot of money during the year. So I understand – So by letting her – and I get your point. So it's not as bad as one might think because, in essence, she was paying her way in with the profits that she generated, but she didn't have to go out and incur an interest-bearing loan to buy it. Sure. So, all right. And there's an interest element built into the computation, but the point being, I'm not certain if an orthodontist two years out of school can come up with a $700,000 loan. This is something that the parties worked out together so that it was in their minds at that present time. Obviously, the whole document that they agreed to, they felt was fair and reasonable to both parties. Are there any other questions? Thank you all. Thank you, Counselor. Counselor? Counselor? I'll be very brief, and I'm not going to rehash the points that have already been discussed in length. And I know this wasn't intentional on Mr. Nelson's part, but he referred to the agreement in question, which is the agreement for sale of membership interest and limited liability company, an agreement for the conducting of professional business operations, as the operating agreement. This is not the company's operating agreement. And I believe this is in the record, but there is one operating agreement that exists, which, as the Court is probably aware, a corporation has bylaws, and those bylaws govern the operations of the entity. A limited liability company, by statute, has an operating agreement, which is akin to bylaws of acculturation. The one operating agreement that exists here was signed before Dr. McManus entered the practice by Dr. Richards alone. That operating agreement was never changed or amended to include Dr. McManus. Let me ask you this. Below, did the Court find on undisputed facts that, gee, this was a relationship, you know, that there was clause based on affidavits or whatever, evidentiary documents for the Court? Well, I don't remember the exact language of the Court's order, but it did refer to the relationship of the parties, and that was the reason that it found to grant summary judgment. I believe that if the Court looks at the circuit court record, Dr. McManus disputes those assertions by Dr. Richards in large part, or they're attributable to or equally attributable to Dr. Richards in terms of this relationship issue, as the Court below described it. So I believe there are clearly some disputed facts there that are material. It seems pretty clear that these two docs aren't going to be practicing together no matter what, right? Well, I would say the ironic part of all of this, and Mr. Nelson alluded to it, the practice was thriving by Dr. Richards' own admission. In large part, they practiced in different locations, they had different teams, and this came, I think, in some respects as a surprise to Dr. McManus. Well, Manny Ramirez was batting over .300 when the Red Sox got rid of him. It was a pain in the neck, and they figured it wasn't worth it. You know, the affidavits and the supporting documents for the summary judgment motions appear to show some toxic relationships, doesn't it? Well, I think the word toxic to me denotes something completely different than this situation here. I think what is most telling in the record is when I, during the deposition and during the course of the hearing, I believe, concerning the motion for preliminary injunction, was asking Dr. Richards if she, in fact, wanted to be able to do what she wanted, when she wanted, without being answerable at all to Dr. McManus, and she agreed with that. I think that's what's underlying all of this, is that Dr. Richards wants to have the control, and that's the bottom line. Well, it doesn't appear to show that. I mean, some people aren't getting along. There was some testimony about quibbling of the staff and, you know, perhaps name-calling. I don't know. To me, those things are typical in the workplace, and they're trivial. Did that affect the operation of the practice? Dr. McManus would say no, and, in fact, Dr. Richards says the practice was thriving. We were making money. We were doing well. So just to say that those workplace matters affected the practice, I think, is a mistake on the record. Thank you. Thank you, counsel. I will take this case under advisement and render the decision, and now we'll take a break for panel change. Thank you.